**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

Katelyn Ebner, et al.,

                        Plaintiffs,        Case No. 1:17-cv-03722

v.

                                      Michael L. Brown
                                      United States District Judge

Cobb County and Officer Tracy
Carroll,

                        Defendants.

_____/

## ORDER

    This case involves four traffic stops that Defendant Officer Tracy Carroll of the Cobb County Police Department conducted in the spring of 2016. Officer Carroll stopped each Plaintiff for rather mundane traffic violations. In each instance, he conducted a further investigation, believed each Plaintiff exhibited signs of marijuana use, and arrested each for driving under the influence or similar charges. Subsequent drug tests revealed that none of the Plaintiffs had used marijuana. Plaintiffs sued Officer Carroll and Cobb County for violating their Fourth

Amendment rights.  Defendants moved for summary judgment.  (Dkt. 60.)  The Court grants their motion.

## I.    Factual Background

The parties have provided the Court with extensive facts they claim are material.  Many of those facts are utterly irrelevant.[1]  The Court has distilled the facts into those that are undisputed and material to the Court's determination.

### A.    Plaintiffs' Traffic Stops

As explained, this case involves four traffic stops that Defendant Officer Carroll of the Cobb County Police Department ("CCPD") conducted in 2016.  The circumstances surrounding each stop are relatively similar.  But the Court's analysis turns on the individual facts

---

[1] Plaintiff allege, for example, that on the day of her arrest Plaintiff Mbamara "was looking forward to meeting with her friends because she had been fasting for religious purposes and was finally going to break her fast and eat." (Dkt. 65-2 ¶ 92.)  Her anticipation of meeting friends is not material to the issue of whether Officer Carroll mistreated her during the traffic stop.  Plaintiffs also submitted sixty-four pages of facts they claim are in dispute and that preclude summary judgment. (Dkt. 65-2.)  Many of their 315 "disputed" facts duplicate Defendants' 246 facts. (*See* Dkt. 60-2.)  This is not how summary judgment or the statement of facts is supposed to work, the purpose of which is to aid the decision-making process by narrowing those facts pertinent to the Court's determination.

of each.  Plaintiffs hired an expert to review the circumstances of each stop and arrest.  Their expert, Joshua Ott, is a former law enforcement officer who provides expert services on impaired driving and accident reconstruction.  (Dkts. 60-2 ¶¶ 87–88; 65-1 ¶¶ 87–88.)  He agrees that Officer Carroll was well trained on impaired driving recognition and traffic enforcement.  (Dkts. 60-2 ¶ 80; 65-1 ¶ 80.)  He further agrees that an officer can have probable cause for believing someone is driving under the influence (of either drugs or alcohol) even though a subsequent test shows the driver was not under the influence.  (Dkts. 60-2 ¶ 88; 65-1 ¶ 88.)  Finally, he does not dispute Defendants' claim that probable cause existed to arrest each of the four Plaintiffs for impaired driving.  (Dkts. 60-2 ¶ 94; 65-1 ¶ 94.)

### 1.  Plaintiff Katelyn Ebner

A few minutes before midnight on Thursday, April 7, 2016, Plaintiff Ebner was driving home from work at a Mexican restaurant in Kennesaw.  (Dkts. 60-2 ¶¶ 95–96; 65-1 ¶¶ 95–96.)  As she approached an intersection and waited at a stoplight, Officer Carroll pulled up behind her.  (Dkts. 60-2 ¶ 99; 65-1 ¶ 99.)  When the light turned green, both vehicles turned left.  Officer Carroll testified that he saw Ebner cross the

double yellow line while making the turn.  (Dkts. 60-2 ¶ 100; 65-1 ¶ 100.)
He then saw her cross over the white fog line on the right-hand side of
the road.   Ebner continued driving along the white fog line on the
shoulder for about six seconds before returning to the proper lane of
travel.  (Dkts. 60-2 ¶ 101; 65-1 ¶ 101.)   Based on these observations,
Officer Carroll activated his blue lights and stopped Plaintiff Ebner.
(Dkts. 60-2 ¶ 102; 65-1 ¶ 102.)

Plaintiff Ebner does not dispute the officer's claim that she made
an improper turn.   She admitted she "would agree she turned
improperly."  (Dkts. 56-3 at 38:9–11, 40:8; 60-2 ¶ 10; 65-1 ¶ 10.)  Having
reviewed the dashcam footage, Plaintiffs' expert also agrees that Ebner
crossed the double yellow line and white fog line.  (Dkts. 60-2 ¶ 104; 65-
1 ¶ 104.)

After stopping her, Officer Carroll noticed that Plaintiff Ebner's
eyes were watery; another fact she does not dispute.  (Dkts. 60-2 ¶¶ 106–
107; 65-1 ¶¶ 106–107; 65-2 ¶ 5; 72 ¶ 5.)  Plaintiff Ebner provided several
reasons for having watery eyes, including having recently cleaning the
chip machine at the restaurant where she worked.  (*See* Dkt. 65-2 ¶¶ 8–
9.) Officer Carroll shined a flashlight in Ebner's eyes to observe her pupil

size and rebound dilation and also saw that she had eyelid tremors, more

signs of cannabis consumption.  He asked her to step out of the vehicle

and then to pull her eyelids down.  He observed "marked reddening of

her conjunctiva," which he had been trained to recognize as a general

indicator of cannabis consumption.[2]   (Dkts. 60-2 ¶ 111; 65-1 ¶ 111.)

Officer Carroll told Plaintiff Ebner about her driving mistakes and

expressed concern over her ability to drive safely.  He asked if she had

consumed alcohol while at work, and Plaintiff Ebner said she had not.

(Dkts. 65-2 ¶ 25; 72 ¶ 25.)  He then asked her to perform voluntary field

evaluations.  (Dkts. 60-2 ¶ 114; 65-1 ¶ 114.)  She agreed to do so.[3]

---

[2] Plaintiffs dispute that these are reliable indicators of cannabis consumption.  (Dkts. 60-2 ¶¶ 108–109, 111; 65-1 ¶ 108–109, 111.)  In determining probable cause, however, officers may rely on their training and need not question it.  *See United States v. Ballard*, 600 F.2d 1115, 1119 (5th Cir. 1979) ("[O]fficers are entitled to rely on their training and experience in assessing the totality of the circumstances and the inferences which flow from those circumstances.").  And again, a court may not assess the situation with the benefit of hindsight.

[3] Because they claim Officer Carroll had no probable cause to stop them in the first place, Plaintiffs dispute whether Ebner's consent to the field evaluations (or the blood test discussed below) were voluntary.  They also dispute the validity of the field tests that Officer Carroll performed.  They do not, however, dispute that his training and experience taught him that these observations were an indicator of cannabis consumption.  (Dkts. 60-2 ¶ 117; 65-1 ¶ 117.)

During the evaluations, Officer Carroll observed four of eight clues suggesting impairment: Plaintiff Ebner stopped while walking, turned incorrectly, missed heel-to-toe, and took an incorrect number of steps. (Dkts. 60-2 ¶ 120; 65-1 ¶ 120.)   Plaintiff's DUI expert reviewed the dashcam video of the test and saw three of eight clues, though he did not dispute the fourth clue Officer Carroll claimed to have seen.  (Dkts. 60-2 ¶ 121; 65-1 ¶ 121.)  Ebner also completed other evaluations, as instructed by Officer Carroll, but did not exhibit any clues suggesting impairment. (Dkts. 60-2 ¶¶ 122–124; 65-1 ¶¶ 122–124.)  Officer Carroll told Plaintiff Ebner that she was showing signs of having smoked marijuana.  She denied doing so, claiming she had tried marijuana once "like seven years ago." (Dkts. 65-2 ¶¶ 46–48; 72 ¶¶ 46–48.)

Based on the totality of the circumstances (*i.e.*, Ebner's driving violation, personal contact, and field evaluations), Officer Carroll believed he had probable cause to arrest Ebner for driving while impaired because of marijuana consumption.  (Dkts. 60-2 ¶ 126; 65-1 ¶ 126.)  He thus handcuffed Plaintiff Ebner, placing her under arrest.  (Dkts. 65-2 ¶ 49; 72 ¶ 49.)   Plaintiffs' expert does not dispute the existence of probable cause to arrest.  (Dkts. 60-2 ¶ 127; 65-1 ¶ 127.)

Officer Carroll read her an implied consent warning under Georgia law, which requires a person to submit to a blood test or otherwise forfeit his or her license for one year.   GA. CODE ANN. § 40–5–67.1.   Ebner consented to the blood test, though Plaintiffs claim her consent was not voluntary because "she thought that when an officer tells you to do something, you do it." (Dkts. 60-2 ¶ 128; 65-1 ¶ 128; 65-2 ¶ 34.)  Officer Carroll issued two criminal citations, one for DUI and one for failure to maintain lane/improper lane change.   (Dkts. 60-2 ¶ 129; 65-1 ¶ 129.) Officer Carroll detained Plaintiff Ebner for twenty minutes before placing her under arrest. (Dkts. 60-2 ¶ 130; 65-1 ¶ 130.)

A subsequent test of Ebner's blood was negative for drugs, and the prosecutor dismissed all charges. (Dkts. 60-2 ¶ 132; 65-1 ¶ 132.)

### 2.   Plaintiff Princess Mbamara

After attending a party on the evening of March 26, 2016, Plaintiff Mbamara was driving to meet friends. (Dkts. 60-2 ¶ 137; 65-1 ¶ 137.)  A few minute before midnight, Officer Carroll saw her enter a freeway on-ramp, fail to maintain her lane, and weave within her lane. (Dkts. 60-2 ¶ 138; 65-1 ¶ 138.)  Officer Carroll activated his blue lights and stopped her. (Dkts. 60-2 ¶ 141; 65-1 ¶ 141.)

Plaintiff Mbamara admits she drove her car across lane dividers, straddled the lane divider line, and weaved within the lane.  (Dkts. 60-2 ¶ 142; 65-1 ¶ 142.)  She claims she did so because of a car parked on the shoulder of the on-ramp.  (Dkts. 60-2 ¶ 140; 65-1 ¶ 140.)  Again, having reviewed the dashcam video, Plaintiffs' expert also agrees that Plaintiff Mbamara crossed the broken white lane lines, drifted to the far left of her lane, and weaved in her lane.  (Dkts. 60-2 ¶ 143; 65-1 ¶ 143.)

After telling Plaintiff Mbamara why he had pulled her over, Officer Carroll noticed that her eyes were bloodshot as she explained she did not know where she was going.  (Dkts. 60-2 ¶ 146; 65-1 ¶ 146.)  Officer Carroll also testified that he observed eyelid tremors, which his training taught him to recognize as a general indicator of cannabis consumption. (Dkts. 60-2 ¶ 147; 65-1 ¶ 147.)  Officer Carroll testified he noticed a marked reddening of Plaintiff Mbamara's conjunctiva, which (again) he had been trained to recognize as an indicator of cannabis consumption. (Dkts. 60-2 ¶ 149; 65-1 ¶ 149.)  He then used a light source to observe Plaintiff's Mbamara's pupils which appeared normal, but he observed her eyes were unable to converge, which he had been taught to recognize as an indicator of cannabis consumption.  (Dkts. 60-2 ¶¶ 152–153; 65-1

¶¶ 152–153.)  He required Plaintiff Mbamara to perform field sobriety tests.   As with Plaintiff Ebner, Plaintiff Mbamara's performance returned some results suggesting impairment while others did not.   For example, on the walk and turn test, she exhibited four of eight clues for impairment, she stopped while walking, turned incorrectly, missed heal-to-toe, and took an incorrect number of steps.  (Dkts. 60-2 ¶ 157; 65-1 ¶ 157.)  Plaintiff's expert reviewed the dashcam video and confirmed three of the eight clues and did not dispute the fourth clue Officer Carroll claims to have seen.  (Dkts. 60-2 ¶ 158; 65-1 ¶ 158.)  On the one-leg stand evaluation, Plaintiff swayed, exhibiting one clue of impairment.  (Dkts. 60-2 ¶ 159; 65-1 ¶ 159.)   While Plaintiff Mbamara denies that she swayed, her expert reviewed the dashcam video and agrees with Officer Carroll.  (Dkts. 60-2 ¶ 160; 65-1 ¶ 160.)  Plaintiffs dispute the underlying validity of these indicators.  (Dkts. 60-2 ¶¶ 150–156; 65-1 ¶ 150–156.)

Based on the totality of the circumstances, Officer Carroll believed he had probable cause to arrest Mbamara for being impaired due to marijuana consumption.  (Dkts. 60-2 ¶ 163; 65-1 ¶ 163.)  Plaintiff's DUI expert does not dispute Officer Carroll's conclusion that he had probable cause to arrest her.  (Dkts. 60-2 ¶ 164; 65-1 ¶ 164.)   Officer Carroll

detained Plaintiff Mbamara for nineteen minutes before placing her under arrest. (Dkts. 60-2 ¶ 168; 65-1 ¶ 168.) Her toxicology reports also were negative for drugs use, and the prosecutor dropped all charges. (Dkts. 60-2 ¶ 170; 65-1 ¶ 170.)

### 3.   Plaintiff Brittany Penwell

Shortly before midnight on March 11, 2016, Plaintiff Brittany Penwell was driving in Austell, Georgia. (Dkts. 60-2 ¶ 172; 65-1 ¶ 172.) She was following her cousin who had been pulled over earlier that day for driving on a suspended license. (Dkts. 65-2 ¶ 212; 72 ¶ 212.) Officer Carroll testified that he observed her cross onto the double yellow lane divider with her driver side tires and then again cross onto the double yellow line as she negotiated a turn. (Dkts. 60-2 ¶ 174; 65-1 ¶ 174.) Based on his observations, Officer Carroll activated his blue lights and stopped her. (Dkts. 60-2 ¶ 175; 65-1 ¶ 175.)

Plaintiff Penwell acknowledges that she touched the yellow line but does not admit she committed any traffic offense. (Dkts. 60-2 ¶ 176; 65-1 ¶ 176.) Plaintiffs' expert reviewed the dashcam video and agrees Penwell crossed onto the double yellow line. (Dkts. 60-2 ¶ 177; 65-1 ¶ 177.)

Officer Carroll testified that once he approached the vehicle, he immediately detected a floral cover-up odor coming from the interior of Penwell's car, something his training had taught him was a possible indicator of cannabis consumption.   (Dkts. 60-2 ¶ 179; 65-1 ¶ 179.) Plaintiff Penwell says she merely had an air freshener hanging from her rear-view mirror, though this is not inherently inconsistent with Officer Carroll's observation of a "cover-up odor."   (Dkts. 60-2 ¶ 179; 65-1 ¶ 179.) Officer Carroll observed that her eyes were bloodshot, a fact Penwell admits, as she had been crying.   (Dkts. 60-2 ¶¶ 180–181; 65-1 ¶¶ 180–181.)

Officer Carroll asked Plaintiff Penwell who she was following, and she said she did not know.   (Dkts. 65-2 ¶ 219; 72 ¶ 219.)   That was a lie. She lied to Officer Carroll because she was scared her cousin would get in trouble.   (Dkts. 65-2 ¶ 219; 72 ¶ 219.)   When confronted, she admitted not telling the truth.   (*Id.*)   Officer Carroll and another officer then arrested her cousin before returning to Plaintiff Penwell.   (Dkts. 65-2 ¶ 220; 72 ¶ 220.)

In addition to noting that her eyes were red, Officer Carroll shined a light into Plaintiff Penwell's eyes and noticed that she had rebound

dilation and eyelid tremors — both things he believed to indicate cannabis use. (Dkts. 60-2 ¶¶ 181–182; 65-1 ¶¶ 181–182.)  Officer Carroll conducted voluntary field sobriety tests, with some returning results showing impairment and others not.  He observed three of eight clues suggesting impairment, including a missed heel-to-toe, walking off the line, and raising her arms for balance. (Dkts. 60-2 ¶ 191; 65-1 ¶ 191.)  He also observed that she swayed during the instructional stage of the evaluation. (Dkts. 60-2 ¶ 191; 65-1 ¶ 191.)  Plaintiffs' DUI expert does not dispute that Penwell exhibited three of the eight clues and that she was swaying. (Dkts. 60-2 ¶ 192; 65-1 ¶ 192.)  She denied "smoking weed" but admitted smoking a "black and mild" cigar. (Dkts. 60-2 ¶ 199; 65-1 ¶ 199.)

Based on his observations, Officer Carroll believed he had probable cause to arrest Plaintiff Penwell for being an impaired and less safe driver because of marijuana consumption, and Plaintiffs' expert did not dispute Officer Carroll's decision. (Dkts. 60-2 ¶ 200; 65-1 ¶ 200.)  Officer Carroll detained Plaintiff Penwell for no more than thirty-two minutes[4]

---

[4] Although the parties dispute the specific amount of time — the incident with Penwell's cousin tacked on additional time because Officer Carroll

before placing her under arrest.  (Dkts. 60-2 ¶ 204; 65-1 ¶ 204.)  Plaintiff Penwell's blood test toxicology report returned negative results, and the charges against her were also dropped.  (Dkts. 60-2 ¶ 206; 65-1 ¶ 206.)

### 4.   Plaintiff Ayokunle Oriyomi

On June 12, 2016, Plaintiff Ayokunle Oriyomi and a friend were driving home from a party at Kennesaw State University.  (Dkts. 60-2 ¶¶ 208–209; 65-1 ¶¶ 208–209.)  Plaintiff Oriyomi was driving and admits that his friend and other people at the party had been smoking marijuana.  (Dkts. 60-2 ¶ 210; 65-1 ¶ 210.)

Cobb County Police Sergeant G.L. Johnson saw Plaintiff Oriyomi fail to maintain his lane and drift multiple times back and forth, touching lane line dividers several times.  (Dkts. 60-2 ¶ 212; 65-1 ¶ 212.)  Having reviewed the dashcam video, Plaintiff's DUI expert agrees that Plaintiff Oriyomi drifted, struck the lane lines, and swerved while driving his car.  (Dkts. 60-2 ¶ 215; 65-1 ¶ 215.)  After making a traffic stop, Sergeant Johnson spoke with Plaintiff Oriyomi and noticed he had "glassy" eyes.

---

had to investigate that vehicle, too — the exact amount of time is immaterial to the Court's determination here.  (Dkts. 60-2 ¶ 204; 65-1 ¶ 204.)

(Dkts. 60-2 ¶ 216; 65-1 ¶ 216.)   A few minutes later, Officer Carroll arrived at the location.  (Dkts. 60-2 ¶ 219; 65-1 ¶ 219.)

The parties dispute whether a strong odor of marijuana was coming from inside Plaintiff Oriyomi's vehicle.  Officer Carroll says he smelled it — an obvious sign of marijuana use.  (Dkts. 60-2 ¶ 216; 65-1 ¶ 216.) Plaintiff Oriyomi testified that he could not smell the marijuana himself but admits it could have been coming from his friend, who had smoked marijuana at the party.  (Dkt. 56-5 at 57:11–15.)  Officer Carroll testified that he observed Oriyomi's eyes to be bloodshot and glassy.  (Dkts. 60-2 ¶ 220; 65-1 ¶ 220.)

Officer Carroll used a light to look into Plaintiff Oriyomi's eyes and saw rebound dilation, reddened conjunctiva, and eyelid tremors — all things he believed to indicate cannabis consumption.  (Dkts. 60-2 ¶¶ 223–226; 65-1 ¶¶ 223–226.)   Officer Carroll then performed field sobriety tests, which, like the rest of Plaintiffs' stops, returned some results suggesting impairment.  (Dkts. 60-2 ¶ 224; 65-1 ¶ 224.)  Plaintiff's DUI expert, like Officer Carroll, also observed Plaintiff Oriyomi exhibit three of eight clues during the walk-and-turn test, and also observed the use of

his arms to maintain his balance during the instructional stage. (Dkts. 60-2 ¶ 231; 65-1 ¶ 231.)

Based on the totality of the circumstances, Officer Carroll believed he had probable cause to arrest Plaintiff Oriyomi for being an impaired and less safe driver because of marijuana use. (Dkts. 60-2 ¶ 239; 65-1 ¶ 239.) Plaintiffs' expert does not deny that Officer Carroll had probable cause. (Dkts. 60-2 ¶ 240; 65-1 ¶ 240.) Sergeant Johnson and Defendant Carroll detained Plaintiff Oriyomi for twenty-two minutes before placing him under arrest. (Dkts. 60-2 ¶ 243; 65-1 ¶ 243.) Again, his blood test was negative for drugs. (Dkts. 60-2 ¶ 245; 65-1 ¶ 245.) Prosecutors dropped the DUI and reckless driving charges. Plaintiff Oriyomi, however, entered a nolo contendere plea for the crime of failure to maintain a lane. (Dkts. 60-2 ¶ 246; 65-1 ¶ 246.)

### B. Defendant Cobb County and CCPD Training

Defendant Cobb County, Georgia, operates CCPD. (Dkts. 60-2 ¶ 1; 65-1 ¶ 1.) While CCPD officers like Officer Carroll are County employees, the County does not exercise control over or supervise officers' day-to-day activities. (Dkts. 60-2 ¶ 2; 65-1 ¶ 2.) At the time of Plaintiffs' stops and arrests, the County had in effect CCPD Traffic Enforcement Policy

5.18, with was intended to reduce fatalities, personal injuries, and property damage from traffic accidents.  (Dkts. 60-2 ¶ 5; 65-1 ¶ 5.)

All CCPD officers must undergo basic training and obtain certification by the Peace Officers Safety and Training Council (POST), the accrediting agency for law enforcement officers in the State of Georgia.  (Dkts. 60-2 ¶ 6; 65-1 ¶ 6.)  Officers must maintain their certifications and participate in ongoing training throughout their employment with CCPD.  (Dkts. 60-2 ¶ 6; 65-1 ¶ 6.)  CCPD also trains its officers to respond to and investigate impaired driving and unsafe driving patterns.  (Dkts. 60-2 ¶ 10; 65-1 ¶ 10.)

Some CCPD officers also receive specialized training to become certified Drug Recognition Experts.  (Dkts. 60-2 ¶ 34; 65-1 ¶ 34.).  Many of the parties' facts concern the reliability of the Drug Recognition Expert ("DRE") protocol.  Yet it is undisputed that Officer Carroll never used the DRE protocol on any of the four Plaintiffs.  Plaintiffs contend Officer Carroll performed the post-arrest DRE twelve-step assessment on Plaintiff Penwell but cite no meaningful, admissible evidence to support this claim.  They merely cite Plaintiff Penwell's declaration that "I learned later that Officer Carroll wrote down that he did a 12-step

evaluation on me at the police station." (Dkt. 65-6 ¶ 50.)  The declaration statement, however, does not undermine the undisputed fact that Officer Carroll did not perform the DRE protocol on any of the four Plaintiffs:  "I did not perform the post-arrest DRE 12-step assessment on any of the four (4) plaintiffs as I did not believe it was necessary based on their respective driving manifestations and road-side evaluations yielding probable cause." (Dkt. 60-4 ¶ 43.)  The facts about the DRE protocol and its reliability (or lack thereof) are thus immaterial to the Court's summary judgment determination.

Following their arrests, Plaintiffs sued Officer Carroll and Cobb County for unlawful seizure, false arrest, unlawful search and seizure, and malicious prosecution in violation of their Fourth Amendment rights under 42 U.S.C. § 1983.  (Dkt. 9 at 16–19.)  Defendants now move for summary judgment.  (Dkt. 60.)

## II.  Legal Standard

Rule 56 of the Federal Rules of Civil Procedure provides that a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A factual dispute is

genuine if the evidence would allow a reasonable jury to find for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). And a fact is "material" if it is "a legal element of the claim under the applicable substantive law which might affect the outcome of the case." *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997).

The party moving for summary judgment bears the initial burden of showing a court, by reference to materials in the record, that there is no genuine dispute as to any material fact that a jury should decide at trial. *Hickson Corp. v. N. Crossarm Co.*, 357 F.3d 1256, 1260 (11th Cir. 2004) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). A moving party meets this burden merely by " 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 325. The movant, however, need not negate the other party's claim. *Id.* at 323. In determining whether the moving party has met this burden, a court must view the evidence and all reasonable factual inferences in the light most favorable to the party opposing the motion. *Johnson v. Clifton*, 74 F.3d 1087, 1090 (11th Cir. 1996).

Once the movant has adequately supported its motion, the nonmoving party then has the burden of showing that summary judgment is improper by coming forward with specific facts showing a genuine dispute. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Ultimately, there is no genuine dispute for trial when the record as a whole could not lead a rational trier of fact to find for the nonmoving party. *Id.* But "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson*, 477 U.S. at 247–48. The court, however, resolves all reasonable doubts in the favor of the non-movant. *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993).

## III.   Discussion

Plaintiffs assert claims against Defendant Officer Carroll under § 1983 for Fourth Amendment violations including (1) unlawful seizure during the field sobriety tests, (2) false arrest, (3) unlawful search and seizure during the blood testing, and (4) malicious prosecution. They also seek to assert *Monell* municipal liability against Defendant Cobb County for each of these constitutional violations. Defendants argue Plaintiffs

have not come forward with evidence from which a reasonable jury could conclude that a constitutional violation occurred because Officer Carroll had probable cause to stop each Plaintiff for traffic violations and then to investigate them for driving under the influence. They alternatively argue that qualified immunity shields Officer Carroll from liability because at a minimum, arguable probable cause supported his actions. The Court agrees.

### A.   Qualified Immunity

"Qualified immunity offers complete protection for government officials sued in their individual capacities if their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Vinyard v. Wilson*, 311 F.3d 1340, 1346 (11th Cir. 2002) (internal quotation marks omitted). So "[q]ualified immunity gives government officials breathing room to make reasonable but mistaken judgments about open legal questions." *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011). It allows officials to "carry out their discretionary duties without the fear of personal liability or harassing litigation." *Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir. 2002). When properly applied, qualified immunity thus "protects all but the plainly

incompetent or those who knowingly violate the law." *al-Kidd*, 563 U.S. at 743 (internal quotation marks omitted).

Qualified immunity may attach only when the officer is "acting within the scope of his discretionary authority when the allegedly wrongful acts occurred." *Grider v. City of Auburn*, 618 F.3d 1240, 1254 n.19 (11th Cir. 2010). The parties agree that Officer Carroll was acting within his discretionary duties. (Dkts. 60-2 ¶ 82; 65-1 ¶ 82.) Plaintiffs thus have the burden of showing that qualified immunity is unavailable to him. *See Lee*, 284 F.3d at 1194.

The qualified immunity analysis presents two questions: first, whether the allegations, taken as true, establish the violation of a constitutional right; and second, if so, whether the constitutional right was clearly established when the violation occurred. *Hadley v. Gutierrez*, 526 F.3d 1324, 1329 (11th Cir. 2008). These distinct questions "do not have to be analyzed sequentially." *Fils v. City of Aventura*, 647 F.3d 1272, 1287 (11th Cir. 2011). Instead, a court may address them in either order, although a plaintiff's failure on either prong dooms his or her claims. *Id.*

On summary judgment, the burden thus lies with Plaintiffs to show that Officer Carroll's actions violated the relevant constitutional right

and that the right was clearly established at the time.  *See Hadley*, 526 F.3d at 1329.

### 1.  Plaintiffs' § 1983 Claims Against Officer Carroll

The Court first considers whether Officer Carroll's initial traffic stops of Plaintiffs' vehicles were constitutionally proper.  It then considers the propriety of Plaintiffs' subsequent arrests.

### a.  The Initial Investigatory Traffic Stops

Officer Carroll says he is entitled to qualified immunity against claims he violated Plaintiff's constitutional rights when he stopped their cars.  "When an officer asserts qualified immunity, the issue is not whether reasonable suspicion existed in fact, but whether the officer had 'arguable' reasonable suspicion to support an investigatory stop." *Jackson v. Sauls*, 206 F.3d 1156, 1166 (11th Cir. 2000).  "It is axiomatic that an officer may, consistent with the Fourth Amendment, conduct a brief investigatory stop when the officers has a reasonable, articulable suspicion that criminal activity is afoot." *Reid v. Henry Cty.*, 568 F. App'x 745, 748 (11th Cir. 2014) (quoting *Illinois v. Wardlow*, 528 U.S. 119, 124 (2000)).  While " 'reasonable suspicion' is a less demanding standard than probable   cause   and   requires   a   showing   considerably   less   than

preponderance of the evidence, the Fourth Amendment requires at least a minimal level of objective justification for making the stop." *Wardlow*, 528 U.S. at 123.  A court must examine the totality of the circumstances to determine whether an officer had reasonable suspicion for a stop, based on the facts "known to the officer at the time of the stop." *Reid*, 568 F. App'x at 748.  "[T]he officer's motive in making the traffic stop does not invalidate what is otherwise objectively justifiable behavior under the Fourth Amendment." *United States v. Harris*, 526 F.3d 1334, 1337 (11th Cir. 2008) (internal quotation marks omitted).

The Court holds that, based on the totality of the circumstances — and the facts known to Officer Carroll at the time of each stop — arguable reasonable suspicion existed to support each investigatory stop.  *See Jenkins v. Gaither*, 543 F. App'x 894, 897 (11th Cir. 2013) (finding no constitutional violation because officer had reasonable suspicion to stop plaintiff's vehicle).  Georgia law provides that "[a] person shall not drive . . . any moving vehicle while[ ] [u]nder the influence of alcohol [or any drug] to the extent that it is less safe for the person to drive."  GA. CODE ANN. § 40–6–391(a).  Georgia law also provides that "[a] vehicle shall be driven as nearly as practicable entirely within a single lane and

shall not be moved from such lane until the driver has first ascertained that such movement can be made with safety." *Id.* § 40–6–48(1). And under Georgia law, "[i]t is well established that weaving, both out of one's lane and within one's lane, particularly when combined with other factors, may give rise to reasonable articulable suspicion on the part of a trained law enforcement officer that the driver is violating the DUI laws." *Ivey v. State*, 689 S.E.2d 100, 102 (Ga. Ct. App. 2009).

Even if reasonable suspicion did not in fact exist, an officer in Officer Carroll's position had at least "arguable reasonable suspicion to support [the stops]." *See Jackson*, 206 F.3d at 1166. Officer Carroll testified that he observed each Plaintiff cross or touch the painted lines dividing the roadway or make an improper turn, in violation of Georgia law. Each incident occurred late at night and in darkness. Having reviewed each dashcam video, Plaintiffs' expert likewise did not disagree with Officer Carroll's evaluation that each Plaintiff did something worthy of an investigatory stop.

Finally, the Court has reviewed the available dashcam footage of each stop. The Court similarly finds the footage supports the otherwise undisputed fact that each Plaintiff violated Georgia law in such a way to

24

prompt Officer Carroll to begin an investigatory traffic stop. And "[a] law enforcement officer may legally stop an automobile traveling on the highways if he has probable cause to believe that a traffic violation has occurred." *United States v. Purcell*, 236 F.3d 1274, 1276 n.5 (11th Cir. 2001) (citing *Whren v. United States*, 517 U.S. 806, 810 (1996)).

Plaintiffs assert that "[a] stop based solely on the 'hyper-technical' violation of 'lane touching' without more, cannot be legally justified" and cite *United States v. Hernandez*, 17 F. Supp. 3d 1255, 1257 (N.D. Ga. 2014). (Dkt. 65 at 9.) The Court does not disagree with that assertion generally but finds it inapplicable here. In *Hernandez*, the district court held the officer had no reasonable suspicion to stop the criminal defendant's vehicle because the officer admittedly instituted the early Sunday afternoon stop "solely and strictly based on [the driver's] purported technical violation of touching the line of her lane while driving on two occasions." 17 F. Supp. 3d at 1257. And there was no "additional" conduct that created a reasonable suspicion of other criminal conduct. *Id.* at 1258.

There was additional conduct here. Each of these stops occurred late at night (not Sunday afternoon) when impaired driving is more likely

and when, based on Officer Carroll's experience, drivers under the influence commonly fail to maintain their lanes. *See United States v. Bryson*, No. 1:13-CR-09-ODE-GGB, 2013 WL 5739055, at *5 (N.D. Ga. Oct. 21, 2013) (finding reasonable suspicion based on similar facts). Moreover, in *Hernandez*, the officer admitted he followed the defendant with the specific plan to stop her for a traffic violation before she could leave the county. 17 F. Supp. 3d at 1260. No evidence suggests Officer Carroll targeted these Plaintiffs or deliberately sought a pretext to stop them. Instead, the undisputed evidence shows he stopped each Plaintiff because, based on the totality of the circumstances and the facts within his knowledge, he observed traffic violations prompting a reasonable suspicion of other criminal conduct.

"And it is by now well-settled law that the reasonable suspicion inquiry focuses on the information available to the officers at the time of the stop[,] not information that the officers might later discover." *United States v. Lewis*, 674 F.3d 1298, 1305 (11th Cir. 2012). The standard thus "must be judged not with clinical detachment[ ] but with a common-sense view to the realities of normal life." *Smallwood v. Ainsworth*, 542 F. App'x 807, 809 (11th Cir. 2013) (internal quotation marks omitted). So

based on the totality of the circumstances — and the information available to an officer in Officer Carroll's position — the Court holds he had arguable reasonable suspicion to stop each of the four Plaintiffs. *See Llorente v. Demings*, 743 F. App'x 327, 329 (11th Cir. 2018) ("[C]ourts should examine the question of qualified immunity by asking whether the official acted reasonably under the circumstances at the time the events in question were occurring, not some time period later.") (quoting *Hunter v. Bryant*, 502 U.S. 224, 228 (1991)).  Because arguable probable cause existed to stop each Plaintiff and conduct an investigatory stop, Officer Carroll is entitled to summary judgment on Plaintiffs' § 1983 claim for unlawful seizure.[5]

---

[5] The Court likewise holds that Plaintiffs' detentions were no longer than reasonably necessary and that no genuine dispute of material fact exists about this. *See United States v. Harris*, 928 F.2d 1113, 1117 (11th Cir. 1991) ("Where . . . the initial stop was legal, the officer had the duty to investigate suspicious circumstances that then came to his attention." (internal quotation marks omitted) (alterations adopted)).  Beyond Plaintiffs' disagreement with the actual field sobriety tests themselves, which they claim Officer Carroll conducted without probable cause, Plaintiffs present, and the Court can find, nothing in the record to suggest Officer Carroll otherwise improperly extended the scope or duration of the investigatory traffic stops.

### b.    Arrests for Driving Under the Influence

The Court must next determine whether arguable probable cause existed to arrest Plaintiffs for driving under the influence.  If Officer Carroll had probable cause to arrest them, their claims for false arrest and malicious prosecution must necessarily fail.

"Probable cause is 'a standard well short of absolute certainty.'" *Smallwood*, 542 F. App'x at 809 (quoting *L.A. Cty. v. Rettele*, 550 U.S. 609, 615 (2007)).  An officer has probable cause to arrest "if the facts and circumstances within the officer's knowledge, of which he has reasonably trustworthy information, would cause a prudent person to believe, under the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense."  *Carter v. Butts Cty.*, 821 F.3d 1310, 1319 (11th Cir. 2016); *see also Boyd v. State*, 658 S.E.2d 782, 784 (Ga. Ct. App. 2008) (internal quotation marks omitted) (alterations adopted) (finding probable cause "if, considering the totality of the circumstances, at the time of arrest he had a reasonable belief that the defendant had committed a crime in his presence or within his knowledge").

The test for qualified immunity is not whether the officer had actual probable cause to support the arrest.  All federal courts recognize the

"inevitab[ility] that law enforcement officials will in some cases reasonably but mistakenly conclude that probable cause is present," and that, in such cases, the law should not hold officers personally liable for their reasonable mistakes. *Anderson v. Creighton*, 483 U.S. 635, 641 (1987). Qualified immunity thus extends to arrests based on *arguable* probable cause, which exists if a reasonable officer, in the same circumstances and possessing the same knowledge as the officer in question, "*could* have believed under the totality of the circumstances that probable cause existed to arrest." *Brienza v. Gee*, 307 F. App'x 352, 353 (11th Cir. 2009) (emphasis added). In other words, "[e]ven without actual probable cause . . . a police officer is entitled to qualified immunity if he had only 'arguable' probable cause to arrest the plaintiff." *Gates*, 884 F.3d at 1298.

The elements of the alleged crime and the facts of the case determine whether an arresting officer possesses probable cause or arguable probable cause. *Crosby v. Monroe Cty.*, 394 F.3d 1328, 1333 (11th Cir. 2004). The existence of probable cause at the time of arrest, however, constitutes an absolute bar to a Section 1983 action for false arrest and malicious prosecution. *See Wood v. Kesler*, 323 F.3d 872, 882

(11th Cir. 2003) (holding existence of "probable cause bars his § 1983 malicious prosecution claim"); *Marx v. Gumbinner*, 905 F.2d 1503, 1505–06 (11th Cir. 1990) ("The existence of probable cause . . . is an absolute bar to a section 1983 action for false arrest.").

Given the undisputed facts, the Court holds that a reasonable officer in Officer Carroll's position could have concluded that probable cause existed to arrest Plaintiffs for DUI violations.  First, the Court has already determined that Officer Carroll had a reasonable, articulable suspicion to make the investigatory stops of each Plaintiff's car.  This weighs in favor of a finding of arguable probable cause.

He saw Plaintiff Ebner cross the double-yellow line when making a left turn and then cross over the white fog lane and drive out of the lane of travel for a few seconds before returning to the proper lane of travel.  It was late (nearly midnight) and dark outside.  Plaintiff Ebner also agreed that she "turned improperly."  Plaintiffs' expert also agreed that she crossed over the double yellow lines and that she then crossed over the white fog line.  He also observed Plaintiff Mbamara weaving in her lane and saw Plaintiff Penwell cross a double-yellow line when taking a

turn. Finally, he received information from Sergeant Johnson that Plaintiff Oriyomi was weaving in his lane.

Officer Carroll's observations at the scene of the traffic stop (or the information he received from Sergeant Johnson) thus underscore that arguable probable cause existed to arrest Plaintiffs for DUI. The late-night hour of the traffic stops (all around midnight) further strengthens the basis for arguable probable cause. For instance, the parties agree — and commonsense dictates — that impaired driving is a serious problem and motorists driving late at night and weaving provides grounds for suspicion that the driver might be impaired. (Dkts. 60-2 ¶ 97; 65-1 ¶ 97.) It is also undisputed that Officer Carroll was an extraordinarily experienced and well-trained officer, and he may rely on his training and experience in making a probable cause determination.

Officer Carroll had information that each Plaintiff committed at least one traffic infraction, justifying his initial investigatory stops of their vehicles. *See Terrell v. Smith*, 668 F.3d 1244, 1251–52 (11th Cir. 2012) ("[A] law enforcement officer may stop a vehicle for violating traffic laws or applicable equipment regulations."). When he examined their eyes, he observed things like red and watery eyes, reddened conjunctiva,

rebound dilation and eyelid tremors — all things he had been trained to view as signs of cannabis use.  While conducting field sobriety testing, he observed each Plaintiff exhibit several clues suggesting some level of impairment.   After viewing the dashcam videos of the encounters, Plaintiffs' expert did not dispute that probable cause existed to arrest each of the four Plaintiffs for impaired driving.  This buttresses the Court's determination that the undisputed facts show that Officer Carroll had at least arguable probable cause to arrest Plaintiffs for DUI.  (Dkts. 60-2 ¶ 94; 65-1 ¶ 94.)

Plaintiffs provide the Court with a flood of immaterial facts to try to explain why Plaintiffs drove, behaved, appeared, or performed as they did on each of the nights that they encountered Officer Carroll.  For instance, they explain that Plaintiff Penwell had been crying because her father had died a year before, thus explaining her admittedly watery and red eyes.  (Dkt. 65-2 ¶ 211.)  They also assert that Plaintiff Ebner had cleaned the tortilla chip machine at work before leaving, thus causing her eyes to water.  (*Id.* ¶ 9.)  And Plaintiff Mbamara was driving to a friend's house to break her Good Friday fast and was unfamiliar with the

directions.  (*Id.* ¶ 78.)   These facts may all be true.   But they are immaterial.

In looking at both the propriety of the initial traffic stops and the appropriateness of the DUI arrests, the Court does not concern itself with after-the-fact explanations for why someone's eyes were watery or where the driver was intending to go.  The Court also does not consider actions Plaintiffs contend Officer Carroll *should* have taken.  For instance, they argue that Officer Carroll "did not rule out other explanations for eye redness such as whether she wore contacts or had other medical issues." (*See id.* ¶ 267; Dkt. 72 ¶ 267.)  Of course, in looking at the events with the benefit of hindsight, Officer Carroll *could* have taken many different actions and asked many different questions.  But as stated above, the Court bases its analysis on the record evidence of the circumstances Officer Carroll confronted at the time, not from the perspective of its peaceful chambers.  *See Piazza v. Jefferson Cty.*, 923 F.3d 947, 953 (11th Cir. 2019).  The Court does not second-guess the judgment of law enforcement officers with "could haves" and "should haves" laid out by lawyers during litigation but rather considers the officers' judgment in the context and in the field.  *See Williams v. Deal*, 659 F. App'x 580, 596

(11th Cir. 2016) (recognizing that courts "usually don't second-guess the decisions made by police officers in the field" (internal quotation marks omitted)).

So the fact that each of the four Plaintiffs' drug toxicology reports returned negative results and the charges were later dropped[6] does not impact the Court's analysis. Plaintiffs also contend that Officer Carroll made several errors while conducting the field sobriety tests. But again, these assertions come with the benefit of hindsight — specifically Plaintiffs' analysis of the dashcam video. *See Smallwood v. Ainsworth*, No. 1:11-cv-03835-JOF, 2013 WL 12123773, at \*2 n.2 (N.D. Ga. Mar. 5, 2013), *aff'd*, 542 F. App'x 807 (11th Cir. 2013) (finding arguable probable cause based on totality of the circumstances, despite accusations from the plaintiff's expert of improper administration of field sobriety tests). "Because 'arguable probable cause' is determined by the facts and circumstances present at the time of the arrest, the results of [the arrestee's drug or alcohol tests] are irrelevant to the question of whether a Fourth Amendment violation occurred when" Officer Carroll arrested

---

[6] Plaintiff Oriyomi entered a nolo contendre plea for his charges but the prosecutor decided to drop or not bring charges against the other three Plaintiffs. (*See* Dkt. 65-1 ¶¶ 133, 171, 207, 246.)

Plaintiffs Ebner, Mbamara, Oriyomi, and Penwell. *See Brienza*, 307 F. App'x at 354 (internal citation omitted). "With the benefit of hindsight, it appears that [Plaintiffs] should not have been arrested for driving under the influence." *Id.* But the undisputed facts show that Officer Carroll had "arguable probable cause" to arrest each Plaintiff on the DUI charge.[7] *See Smallwood*, 542 F. App'x at 809–10 (affirming finding that custodial DUI arrest was proper where probable cause existed to believe that motorist appeared to drift in her lane and then furnished some clues of impairment in field sobriety tests).

But even if Defendant Carroll did not have arguable probable cause to arrest Plaintiffs for DUIs, he had arguable probable cause to arrest them for their traffic violations. "The existence of a traffic violation can provide an officer with arguable probable cause to make an arrest, even though the offense is minor or normally punishable by a monetary citation, even if the officer had no knowledge of that violation at the

---

[7] Because Officer Carroll had arguable probable cause to arrest each Plaintiff for DUI, their claims related to their toxicology blood draws likewise must fail. Their voluntary consent to the blood draws also otherwise independently forecloses their claims. *See Birchfield v. North Dakota*, 136 S. Ct. 2160, 2185 (2016) ("It is well established that a search is reasonable when the subject consents.").

time." *Reid*, 568 F. App'x at 748.  Indeed, "an arrest may be for a different crime from the one for which probable cause actually exists, . . . but arguable probable cause to arrest for *some* offense must exist in order for officers to assert qualified immunity from suit." *Wilkerson v. Seymour*, 736 F.3d 974, 979 (11th Cir. 2013) (internal citations omitted).  The Court finds that standard met here.

Officer Carroll witnessed, and each Plaintiff admitted or did not dispute, that they committed one or more driving infractions that led to the traffic stop.  (Dkts. 56-1 at 29:1–12, 29:22–30:1 (Plaintiff Penwell admitted she crossed the double yellow line more than once); 56-2 at 48:19–25, 49:1–13 (Plaintiff Mbamara agreed that she switched lanes and was weaving); 56-3 at 38:9–11, 41:19–20 (Plaintiff Ebner agreed she turned improperly); 56-5 at 56:5–10 (Plaintiff Oriyomi admitting he failed to maintain his lane).  A thorough review of the dashcam footage likewise does not put any of this into genuine dispute.  See *Shaw v. City of Selma*, 884 F.3d 1093, 1098 (2018) (citations omitted) (alterations accepted) ("[I]n cases where a video in evidence obviously contradicts the nonmovant's version of the facts, [a court] accept[s] the video's depiction instead of the nonmovant's account and view[s] the facts in the light

depicted by the videotape.")  Neither party has disputed the accuracy or authenticity of the dashcam videos or suggested they are untrustworthy. As a result, the Court "accept[s] facts clearly depicted in a video recording even if there would otherwise be a genuine issue about the existence of those facts."  *Id.* at 1097 n.1.

Plaintiffs' expert likewise agreed with Officer Carroll's assessments and did not disagree that he had probable cause to arrest each Plaintiff. And the Fourth Amendment does not forbid a warrantless arrest for a minor offense.  *See Atwater v. City of Lago Vista*, 532 U.S. 318, 354 (2001) ("If an officer has probable cause to believe that an individual has committed even a very minor criminal offense in his presence, he may, without violating the Fourth Amendment, arrest the offender.").

Plaintiffs misapply the applicable standard throughout their brief. They seem to assume that, in order for probable cause to exist, Defendants have to show that every officer and every juror would agree that probable cause existed.  They specifically assert that "[a] reasonable jury could conclude after viewing each Plaintiffs' dashcam videos and considering other evidence that . . . there was no probable cause or reasonable suspicion to stop them."  (Dkt. 65 at 17–18.)  In determining

whether probable cause (or arguable probable cause) existed, a court inquires into whether *an officer* could reasonably believe probable cause to arrest or reasonable suspicion to stop existed.  And the undisputed facts show that it arguably did.

Ultimately, Plaintiffs' gripes are with the law enforcement system generally, including the "voluntariness" of voluntary consent once a cop pulls over an individual, along with the unfortunate aftereffects arising from a DUI arrest for which the person was not in fact drunk or high. (*See* Dkt. 65-2 ¶¶ 57–60.)  An encounter with a police officer like the ones at issue here may be a nerve-wracking experience.  A driver might perform poorly on the field sobriety tests, not because he or she is impaired by drugs or alcohol, but because of nerves, fear, tiredness, or embarrassment.   But, that does not automatically give rise to a constitutional violation.

And while it seems minor in hindsight, and when viewed with the later-learned knowledge that none of the Plaintiffs tested positive for drugs, a court is not to consider facts beyond what was known to the officers at the time of detention.  *See United States v. Lewis*, 674 F.3d at 1305 (holding district court erred by considering facts beyond what

officers knew "at the time of the detention"). The Court holds that no constitutional violation occurred in Officer Carroll's execution of the arrests of each of the four Plaintiffs and that he is entitled to qualified immunity on Plaintiff's claims for false arrest and malicious prosecution.[8]

## B. *Monell* Claims against Defendant Cobb County

Finally, because Plaintiffs did not suffer any constitutional deprivations, they cannot recover from the County under section 1983. *See Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978); *see also Montanez v. City of Orlando*, 678 F. App'x 905, 912 n.3 (11th Cir. 2017) (per curiam) ("Because we conclude that no violation of [plaintiff's] constitutional rights occurred, we need not consider whether the City had an official policy."). The Court alternatively finds that Plaintiffs have failed even to plead adequately a formal or informal policy that could support liability against Defendant Cobb County.[9]  For these reasons, the Court thus

---

[8] The Court likewise holds that Plaintiffs have failed to show that the law was clearly established at the time of each incident and have failed to point to materially similar precedent putting every officer on notice that this conduct would be unconstitutional.  None of the cases Plaintiffs cite do this.  (*See* Dkt. 65 at 43–44.)  For this alternative reason, the Court finds Officer Carroll entitled to qualified immunity.

[9] The record also contains no evidence sufficient to survive summary judgment.  Interestingly, the Court notes that Defendants did not file a

grants summary judgment to Defendants on that issue and dismisses all claims against Defendant Cobb County.

## IV.  Conclusion

The Court **GRANTS** Defendants Officer Tracy Carroll and Cobb County's Motion for Summary Judgment (Dkt. 60).

**SO ORDERED** this 9th day of March, 2020.

_____
MICHAEL L. BROWN
UNITED STATES DISTRICT JUDGE

---

dispositive motion to dismiss the County as a party defendant before the start of discovery, despite now asserting that Plaintiffs' claim against it would not survive a motion to dismiss.  (Dkt. 60-1 at 17.)